## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**DANIELLE OTTE and**
**AMBER KAY,**

      **Plaintiffs,**

      **v.**

**UMB BANK N.A.,**

      **Defendant.**

**Case No. 2:19-cv-02351-HLT-GEB**

## MEMORANDUM AND ORDER

Plaintiffs Danielle Otte and Amber Kay bring claims against Defendant UMB Bank N.A. for discrimination and retaliation. Kay brings one claim of retaliation under 42 U.S.C. § 1981 (Count II). Otte brings one claim of gender discrimination under Title VII (Count III).[1] Defendant has filed separate motions for summary judgment on both claims. Docs. 82 & 84. Defendant also moves to sever. Doc. 86. Because Kay fails to show a prima facie case and both Plaintiffs fail to show pretext, the Court grants Defendant's motions for summary judgment. The Court denies Defendant's motion to sever as moot.

---

[1]    Otte states a claim for retaliation under Title VII in the Pretrial Order. Doc. 80 at 2. But Otte withdrew her retaliation claim in her response to Defendant's motion for summary judgment. Doc. 89 at 1 n.1.

I.      **BACKGROUND**[2]

    A.      **Facts Relevant to Otte.**

Otte began employment at Defendant on October 3, 2006, as a Customer Service Manager at its Atchison branch, and Otte remained a manager throughout her employment at the same branch. On June 28, 2018, Defendant involuntarily terminated Otte from her position of Branch Manager I. Otte filed a Charge of Discrimination in October 2018 that specifically alleged discriminatory and retaliatory treatment by Kristine Batch, Nicole Watson, and Lynda Beahm-Lemmer.[3] Otte filed an Amended Charge in March 2019, and the only material change was an allegation regarding the comparative qualifications of herself and the individual that she believes replaced her at the Atchison branch.

Defendant has a progressive process for disciplinary action for performance issues. Under the policy, Defendant has the option of putting an employee on any type of warning that Defendant sees befitting for that performance issue. On September 25, 2015, Otte received a Level 1 Warning for unacceptable behavior from her supervisor Cathy Schroder, who Otte does not claim retaliated or discriminated against her. On March 9, 2016, Otte received a Level 2 Warning for processing a transaction on her own account from her supervisor, Angela Stewart, who Otte does not claim discriminated or retaliated against her. On May 5, 2016, Otte received a Level 2 Warning

---

[2]   For purposes of summary judgment, the following facts are uncontroverted or recited in the light most favorable to Plaintiffs as the nonmoving parties. Additional uncontroverted facts may be included in the analysis as appropriate. Plaintiffs set forth many additional facts in their responses but do not mention or discuss these facts in their legal arguments. The Court deems these facts immaterial and does not discuss them. *See Shepard v. Sullivan*, 65 F. App'x 677, 681 n.3 (10th Cir. 2003) (holding that a party responding to a motion for summary judgment is not obligated to controvert facts that the moving party does not rely upon as support for its arguments and are only included in its statement of facts). In addition, it is not the Court's role to comb through a party's statement of facts and determine where each fact fits into a party's argument. But even if these facts are considered, they do not change the outcome of these motions. Summary judgment would remain appropriate.

[3]   Batch is a Regional Delivery Manager who for supervises branch managers and personal bankers. She assumed responsibility of supervising Otte in late 2015. Watson is Batch's supervisor. Beahm-Lemmer is in human resources.

Continued (meaning Otte was already on a Level 2) for cash differences from Stewart. On August 18, 2016, Otte received a Level 2 Warning Continued from Batch for overall performance pertaining to a Customer Identification Program. On February 7, 2018, Otte received a Level 2 Warning, Code of Ethics, for Otte's inaccurate completion of the Officer Code of Ethics Attestation. This discipline negatively impacted Otte's compensation.

On June 19-20, 2018, Otte's branch was the subject of an in-person branch review or audit performed by Branch Review Quality Control Analyst Candace Henderson-Smith. An audit is for the purpose of taking a snapshot of branch documentation and records at the time the auditor arrives. Otte received a Branch Documentation Review List at the beginning of the audit. It stated, at the top, "[u]nder no circumstances is it permissible to make any changes to any documentation, all documentation must be presented 'as is.'" Otte admits she is aware of Defendant's policy that documents are not to be altered during an audit and admits that it would be misleading to go in and change documents during an audit.

On the second day of the review, Henderson-Smith identified several documents (Cash Drawer Audit Forms) that had been altered from their original state. Henderson-Smith had copied certain incomplete Cash Drawer Audit Forms on June 19, 2018, but found those forms had been completed when Otte handed them to her on the second day of the audit. Henderson-Smith's audit file thus contains two sets of documents: (1) copies of incomplete Cash Drawer Audit Forms date-marked June 19; and (2) the newly-completed Cash Drawer Audit Forms she received from Otte date-marked June 20.[4] *See* Doc. 83-6 at 14-25. In the Branch Quality Control Review Final Report, Henderson-Smith indicated that the altered documents constituted an "additional risk."

---

[4]   Otte attempts to controvert this by citing her deposition testimony where she maintained that the only documents she provided on the second day of the audit were cover sheets. However, the testimony does not reference the scope of what she provided to Henderson-Smith on a specific day. Moreover, Plaintiff testified that she does not recall what she provided to Henderson-Smith.

Colleen Squires, Henderson-Smith's supervisor, informed Batch that an audit form had been altered between day one and day two of the audit. The altered documents were furnished to Batch. Batch then contacted Watson (her supervisor) and Beahm-Lemmer (human resources) and shared information of the alteration. Batch came to Otte's branch and asked Otte "why [she] had filled out the teller audit sheet." Otte told Batch that she had told Henderson-Smith:

> I did not have the cover sheets on them. I had the audits themselves done, they were inputted into the teller audit system, but I didn't have the cover sheets done. She told me as long as I had them to her by 5:00 or by the time she left that day, that would be fine. So, I filled out the cover sheet or sheets that were missing.

Doc. 83-2 at 151:23-152:23, 155:2-158:18. Batch recommended to Watson that Otte be terminated. Watson and Beahm-Lemmer agreed Otte should be terminated.

Beahm-Lemmer prepared an Involuntary Termination Form, explaining Otte's termination as: "Unsatisfactory performance-associate admitted to providing false information to internal auditors in order to prevent negative employment action since she was already on a Level 2 warning." Doc. 83-4 at 22:22-24:13. Batch and Beahm-Lemmer notified Otte of her termination.

### B.    Facts Relevant to Kay.

Defendant employed Kay from October 7, 2013 until January 23, 2019, the effective date of her involuntary termination. At the time of her termination, Kay had been employed as a Branch Manager II since 2018 and was the highest authority within the two branches she managed. Cory Stone was her first level manager, Stone reported to Watson, and Beahm-Lemmer was the assigned human resources representative. The only individuals Kay claims engaged in unlawful behavior as related to the claims in her lawsuit are Beahm-Lemmer and Stone. The final decision makers on Kay's termination were Stone and Watson.

Kay notified Stone that two subordinate employees, Cheryl Harris and Angelica Reyes, had shared a password. Harris is African American, and Reyes is Hispanic. Harris and Reyes held the same position, had the same security violation, and were on the same level of discipline. Kay and Beahm-Lemmer met to discuss discipline of Harris and Reyes. Kay was "okay" with the termination of Harris but "strongly opposed" the termination of Reyes because Kay thought that Reyes had "potential" or "opportunity." Beahm-Lemmer then explained to Kay how that scenario could potentially be interpreted as discriminatory because Harris was of "protected status" while Reyes was not. Beahm-Lemmer told Kay that "if both associates were not terminated, this would open the bank to a discrimination suit." Doc. 85-3 at 65:6-67:10. Beahm-Lemmer testified that the reference to "protected status" was about Harris's age (over 40). Kay did not reference race, and she does not recall Beahm-Lemmer referencing race in the discussion of Harris and Reyes.

Based on Beahm-Lemmer's direction, Kay submitted emails to Stone on January 15, 2019 that stated, "I am recommending termination for Cheryl Harris" and "I am recommending termination for Angelica Reyes." Doc. 85-2 at 76-77. Neither email contains any reference to race or discrimination. Kay agrees that the terminations of Harris and Reyes followed Defendant's policies regarding levels of progressive discipline.

After Harris and Reyes were terminated, they contacted Beahm-Lemmer who scheduled a meeting with them and her supervisor Sterling Stanford. Reyes and Harris explained that they were perplexed why Kay terminated them for failing to follow security protocol when Kay failed to follow security protocol on a regular basis. They explained that, during the branch opening process, Kay placed them in a "risky position." Beahm-Lemmer asked Stone to speak with Kay about her recollection, and Beahm-Lemmer asked the security department to provide additional details to

confirm or not confirm the report they received. Stone understood the concern to be that Harris and Reyes received guidance to open the bank without being watched or observed.[5]

Beahm-Lemmer and Stone met with Kay to get her side of the conversation. Kay was then placed on paid administrative leave while they gathered additional information. Stone found that Kay "could not answer us," that Kay "said that she had followed and then said that she had not," and that Kay "had differing answers when we were talking to her." Doc. 85-5 at 57:14-58:14. Beahm-Lemmer collected information from some other partners, and security provided still photos of associates entering the branch on the dates in question with time stamps indicating when each entered. Stone believed the photos reflected Kay at another location at the same time she stated she was at Defendant's 6th and Minnesota location. Kay texted Beahm-Lemmer during the investigation "what I know is that had I known the other associate was that far out I would have never told [Harris] it was OK to proceed in without being observed . . . ." Doc. 85-2 at 72.

Kay told Stone and Beahm-Lemmer there were two occasions in January 2019 when she permitted an associate to enter the branch when there was only that associate present, and instructed the associate to send the all-clear message when the second person had yet to arrive. On January 14, 2019, Kay had the following text exchange with Harris:

| Harris | 8:17 | Good morning who's opening with me this morning |
| Kay | 8:19 | Ariel |
| Kay | 8:20 | That's what the schedule shows and I texted you and told you Angelica called in |
| Harris | 8:22 | Ariel said that no one told her that she was opening with me this morning |

---

[5]   Defendant's opening procedures involve two associates, one associate entering the bank and going inside, while a second associate observes that first associate safely going inside the bank. When an associate must enter the branch alone, the alone associate is required to contact Defendant's security division and notify security so that the associate can be watched virtually as the associate enters the branch.

| Kay | 8:23 | It's on the schedule |
|---|---|---|
| Harris | ---- | Ariel comes in at 9am today |
| Kay | 8:24 | My apologies I thought that ariel was scheduled at 815 but it was angelica so Cheryl you will just need to open and wait for ariel no need to call 4810 just send the 1st all clear as normal. |
| Harris | 8:26 | Ok |

Doc. 85-2 at 64-66.

Defendant's investigation revealed through surveillance that Harris entered the branch at 8:28 a.m., within two minutes of Harris's last text to Kay, and that Harris was alone in the branch until 8:51 a.m., when Ariel entered the branch. Defendant discovered that Kay entered the Parallel Parkway branch at 8:41 a.m., which is approximately 11 miles away from the 6th and Minnesota branch. Kay claims that she instructed Harris to enter after Harris told Kay that Ariel was on her way into the branch. Harris disclaimed such a call and Kay could not provide Defendant with a record of such a call. Beahm-Lemmer understood Kay to represent to her and Stone that "she instructed the associate not to contact Security because she did not want to bother them," and that Kay "said she was on her way to the branch and was pulling into the parking lot at the time that [Harris] would be entering the branch." Doc. 85-2 at 68:6-24.

After the information was gathered, Beahm-Lemmer, Watson, and Stone participated in a termination review call. Watson found that Kay not only committed security violations, but she was not honest by claiming she was at the branch when she was not, which Watson understands was validated through security footage. Stone recommended to Watson that Kay be terminated based on security violations and the risk in which Kay had placed associates and the integrity issue resulting from Kay not being honest about it. Watson and Stone decided to terminate Kay.

Following Stone's and Watson's decision, Stone and Beahm-Lemmer called Kay and notified her of the termination decision. Beahm-Lemmer prepared the Involuntary Termination Form, which states the basis for Kay's termination as:

> Unsatisfactory Performance – Amber Kay was terminated as a result of not following security protocol around branch opening procedures. She instructed her associates on more than one occasion to enter the banking branch without the required second opener present in the parking lot. She also instructed them not to contact our internal security department that would normally observe their entry via video when a second associate is not available. When questioned about this event, it appeared as though Amber was not completely honest which then created an integrity issue in addition to failing to follow the security guidelines. As a result her employment was terminated.

Doc. 85-3 at 14.

Defendant's policies provide for immediate termination if the behavior or action is deemed severe enough, even if the employee has not received a Level 1 or 2 Written Warning. Per the investigation:

> Kay was not placed on a Level 2 Written Warning due to the fact that officers and managers of UMB are held to a higher performance standard than the associates they manage. As a manager, she was in a position of authority. As a result of her authority, her team members felt they had to comply with [her] directives.

Doc. 85-3 at 22.

## II.     STANDARDS

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586-87 (1986). Courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.   ANALYSIS

Otte brings one claim of gender discrimination under Title VII. Kay brings one claim of retaliation under 42 U.S.C. § 1981. Defendant moves for summary judgment on both of Plaintiffs' claims. The Court addresses each claim in turn.

### A.   Defendant is entitled to summary judgment on Otte's claim of gender discrimination.

The Court first addresses Otte's Title VII gender discrimination claim. Because Plaintiff does not offer direct evidence of discrimination, the Court follows the *McDonnell Douglas* burden-shifting framework. *Young v. Physician Office Partners, Inc.*, 2020 WL 1446911, at *11 (D. Kan. 2020) (citation omitted). Under this framework, Plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id.* Once Plaintiff establishes a prima facie case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the termination. If Defendant does so, Plaintiff must then show that Defendant's reason was pretextual. *Id.*

#### 1.   For purposes of this motion, the Court finds that Otte can establish a prima facie case of gender discrimination.

To establish a prima facie case of Title VII gender discrimination, a plaintiff must demonstrate by a preponderance of the evidence that: (1) she belongs to a protected class; (2) she was qualified and satisfactorily preforming her job duties; and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Kear v. Kohl's Dep't Stores, Inc.*, 2015 WL 6473549, at *9 (D. Kan. 2015).

The briefing on whether Otte can establish a prima facie case is muddled. Defendant contends Otte cannot show the third element but ties the argument to pretext. Otte responds that she can show the third element because she was replaced by a male with no banking experience. Defendant's reply concedes that a male was selected to fill her position and that Plaintiff can establish a prima facie case of gender discrimination. But Defendant rejects Otte's assertion that she was more qualified for the position than her replacement and again ties its argument back to pretext. Doc. 94 at 31 n.4. The Court finds that Otte establishes a prima facie case of gender discrimination because she is a member of a protected class, was replaced by a male, and there are facts by which a reasonable jury could find that she was qualified and satisfactorily performing her job duties. *See, e.g.*, *Grubbs v. Salvation Army*, 2014 WL 6977943, at *5 (D. Kan. 2014) (citing *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012)) (stating that third element of prima facie case of gender discrimination is satisfied if plaintiff can establish they were replaced by someone not in the protected class).

### 2.   Defendant has a legitimate, nondiscriminatory reason for Otte's termination.

Next, Defendant articulates a legitimate, nondiscriminatory reason for Otte's termination. Defendant need not "litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007). Instead, Defendant needs only to "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII." *Id*. Here, Defendant states that Otte was terminated because she altered financial documents during her branch's audit. This is a gender-neutral, nondiscriminatory reason for terminating an employee. Thus, Defendant meets its burden.

**3.      Otte fails to present evidence demonstrating pretext.**

Defendant is entitled to summary judgment because Otte has not come forward with evidence from which a reasonable jury could conclude that Defendant's gender-neutral reason for dismissal is merely a pretext for concealing intentional gender discrimination. *Gad*, 2016 WL 74399, at *15. A plaintiff may demonstrate pretext by pointing to facts that a factfinder could rely on to conclude that defendant's stated reason is unworthy of belief. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). This can be done by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the stated reason that a reasonable factfinder could find it unworthy of credence. *EEOC v. P.V.N.F., LLC*, 487 F.3d 790, 801 (10th Cir. 2007) (quotation omitted). Pretext may also be shown by providing direct evidence discrediting the proffered rationale, or by showing that the plaintiff was treated differently from other similarly situated employees. *Cox v. Lockheed Martin Corp.*, 545 F. App'x 766, 770 (10th Cir. 2013).

Otte's argument on this issue is difficult to follow. Otte essentially argues that she received permission from Batch (Otte's supervisor) and Henderson-Smith (internal auditor) to complete and turn in delinquent cover sheets during the audit and was then fired for doing so. *See* Doc. 89 at 11-13. But Otte's argument is not supported by the record.

Otte relies primarily on her deposition testimony, where she testified:

> And [Henderson-Smith] went through the list, I gave her everything she needed. I told her that on my teller audits, I had them done, but I didn't have all the cover sheets on them for that quarter. [Henderson-Smith] said that was fine . . . .  So, I got her what she needed and left.
>
> The next day . . . [Henderson-Smith] asked me for the audits that the day prior she had said she didn't need because she was reviewing the previous quarter . . . .

11

> So I, again, I told her I did not have the cover sheets on them. I had the audits themselves done, they were inputted into the teller audit system, but I didn't have the cover sheets done.
>
> [Henderson-Smith] told me as long as I had them to her by 5:00 or by the time she left that day, it would be fine.

Doc. 89-1 at 157:1-21. But this testimony does not establish that Otte asked Henderson-Smith, or received permission from Henderson-Smith, to alter or finalize incomplete documents. It merely establishes that Henderson-Smith gave Otte until 5:00 to turn in the incomplete cover sheets.

Regardless, Henderson-Smith did not initiate Otte's termination—Otte's supervisor (Batch) did.[6] Batch was informed that an audit form had been altered between day one and day two of the audit, and the altered documents were furnished to Batch. Batch then notified Watson and Beahm-Lemmer and shared information of the alteration. Batch recommended that Otte be terminated, and Watson and Beahm-Lemmer agreed. Otte presents no evidence to suggest that she asked, or received permission from Batch,[7] Watson, or Beahm-Lemmer, to alter or finalize incomplete documents. And it is uncontroverted that Batch, Watson, and Beahm-Lemmer were uninvolved in the decision to perform the audit, the performance of the audit, and the findings of Henderson-Smith. Thus, Otte has not established that Defendant was inconsistent in terminating her for providing false information to the internal auditor in violation of Defendant's internal audit policy.

Otte also attempts to minimize the importance of cover sheets and argues that late cover sheets do not affect an audit.[8] This argument is without merit. In analyzing a plaintiff's claim of

---

[6]   Otte testified that she does not believe that Henderson-Smith discriminated or retaliated against her. Doc. 89-1 at 195:21-196:12.

[7]   The only evidence Otte presents shows that she simply notified Batch that "she was behind for that quarter's audit." Doc. 89 at 15.

[8]   Otte fails to controvert Defendant's SOF ¶ 33, which establishes that Henderson-Smith discovered altered Cash Drawer Audit Forms—not "cover sheets." The deposition testimony Otte cites to controvert this statement does

pretext, the court examines the facts as they appear to the individual making the termination decision; the court's role is not to "second guess" the employer's business judgment. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). Nor is the court's role to ask whether the decision was wise, fair, or correct. *Id*. Rather, the court must determine whether the employer honestly believed the legitimate, non-retaliatory reason it gave for its conduct and acted in good faith on that belief. *Id*.

And here, it is uncontroverted that Defendant's policy regarding internal audits strictly prohibits "mak[ing] any changes to any documentation," and that "all documentation must be presented 'as is.'" Henderson-Smith identified and reported altered Cash Drawer Audit Forms during the audit. And Otte has not presented any evidence from which a reasonable jury could conclude that Batch, Watson, or Beahm-Lemmer did not have a good faith basis to believe that Otte had inappropriately altered documents. Accordingly, the uncontroverted material facts establish that Defendant honestly believed the legitimate, non-retaliatory reason it gave for its conduct and acted in good faith on that belief.

Otte also argues that she was treated differently from a male manager, Chris Hunter, who allegedly provided late cover sheets during an audit. To succeed on this theory, Otte must present evidence to demonstrate that she was treated differently from other similarly-situated nonprotected employees who violated work rules of comparable seriousness. *Grant v. Crystal Lake Partners, Inc.*, 460 F. Supp. 3d 1155, 1164 (D. Kan. 2020). Similarly-situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline. *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). A court should

---

not actually reference the scope of what Otte provided Henderson-Smith or specifically dispute that Henderson-Smith identified altered Cash Drawer Audit Forms. See Doc. 89 at 3; Doc. 89-1 at 194:21-195:14.

compare the relevant employment circumstances, such as work history and company policies applicable to the plaintiff and the intended comparable employee. *Robinson v. City of Ark. City, Kan.*, 986 F. Supp. 2d 1020, 1040 (D. Kan. 2012).

Here, Otte presents no evidence regarding Hunter's supervisor, the performance evaluation and discipline standards he was subject to, or his work history. Otte does present evidence suggesting that Hunter had received two Level 2 written warnings, but Otte had received four by the time of her termination. And Otte provides no context by which the Court could infer whether Hunter's warnings arose out of similar circumstances or were of a similar severity or were similarly close in time. *See, e.g.*, *Flanagan v. ScriptPro, LLC*, 2019 WL 1003403, at *8 (D. Kan. 2019) (concluding that plaintiff failed to demonstrate pretext when plaintiff did not show that intended comparable employees shared the same supervisor as plaintiff or that their conduct was of comparable seriousness); *see also Morgan v. Hilti*, 108 F.3d 1319, 1324 (10th Cir. 1997) ("Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment.").

Finally, to the extent Otte argues that she was replaced by a male with no banking experience, the Court finds that Otte has again failed to demonstrate pretext. Otte alleges in her statement of additional facts that she was replaced by a "male employee" who was "less qualified and had no experience in banking or in management." Doc. 89 at 9 (citing Doc. 89-1 at 42:16-43:6). The only support Otte offers for this statement of fact is the following excerpt from her deposition testimony:

> Q.    On what basis do you conclude that he was less qualified than you?
>
> A.    No banking experience. No management experience.

> Q.   And on what basis do you conclude he had no banking experience?
>
> A.   I know him personally.
>
> Q.   Is that the full and complete basis?
>
> A.   Yes.
>
> Q.   On what basis do you conclude he has no management experience?
>
> A.   From conversations with him personally.
>
> Q.   Is that the full and complete basis of your conclusion?
>
> A.   Yes.

Doc. 89-1 at 42:16-43:6.

But this testimony merely establishes that she believes the individual who was selected to replace her was less qualified than she is based on her personal conversations with him. *See* Doc. 89-1 at 42:16-43:6. Otte has presented no evidence regarding her replacement's qualifications or what representations that individual made to Defendant to be selected for the position. Thus, Otte has failed to present evidence by which a reasonable jury could conclude that she was replaced by a less-qualified male employee. *Livingston v. Sodexo, Inc.*, 2013 WL 1308292, at *7 (D. Kan. 2013) (holding that plaintiff's speculation and opinion that she was replaced by a less qualified white male, without providing evidence that he lacked the necessary qualifications, is insufficient to establish a factual dispute regarding pretext); *cf. Velasquez v. Philips Electronics N.A. Corp.*, 2015 WL 505628, at *7 (D. Kan. 2015) (holding plaintiff failed to establish prima facie case of age discrimination when plaintiff presented no evidence identifying plaintiff's replacement or establishing that replacement was younger).

Accordingly, the record lacks evidence from which a reasonable jury could find that Defendant's articulated reason for Otte's termination was mere pretext. Because Otte cannot establish pretext, the Court grants Defendant's motion for summary judgment on Otte's Title VII gender discrimination claim.

**B.      Defendant is entitled to summary judgment on Kay's § 1981 retaliation claim.**

The Court next addresses Kay's § 1981 retaliation claim. Kay argues Defendant terminated her employment in retaliation for her protected expressions of concern as to a matter relating to the race of her subordinate employees. Doc. 80 at 9. Specifically, Kay contends that Defendant wanted to terminate two of her subordinate employees—Harris, who is African-American, and Reyes, who is Hispanic. Kay affirmatively sought for Defendant to retain Reyes, but her efforts were rejected by management, with the stated rationale that to retain Reyes would provide Harris the opportunity to lodge a viable claim of race discrimination. Kay took issue with this reasoning, but her position was rejected. Kay asserts that she was discharged based upon an illegitimate and groundless rationale and Defendant skipped otherwise recognized steps within its own progression/corrective disciplinary policy. *Id*. at 5-6.

Defendant contends that Kay's actions do not constitute protected activity sufficient to support her claims. Defendant further contends that, even if the Court were to find that Kay engaged in protected activity, these actions were not the reason for her termination, and, rather, Kay was terminated due to her disregard of security protocols, which compromised her subordinates' physical safety. As such, Defendant argues that Kay cannot establish the requisite causal connection to show a prima facie case or present evidence of pretext. Because Kay does not supply direct evidence of retaliation, the court must analyze Kay's claim under the *McDonnell*

*Douglas* burden-shifting framework set forth above. *Loudon v. K.C. Rehab. Hospital, Inc.*, 339 F. Supp. 3d 1231, 1237 (D. Kan. 2018).

> **1.      Kay cannot establish a prima facie case of retaliation because she did not engage in a protected activity.**

To prove a prima facie claim for retaliation under § 1981, the plaintiff must show: (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Id.* The parties do not dispute that Kay's termination constitutes a material adverse employment action, satisfying the second element of her prima facie case. But the parties do dispute whether Kay engaged in protected activity sufficient to satisfy the first element of her claims.

Protected opposition can range from filing formal charges to voicing informal complaints to superiors. *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). In the case of informal complaints, there is no clear rule for the level of specificity required. *Garcia–Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 560 (D. Kan. 1995). However, verbal remarks and statements must sufficiently convey concerns about the unlawfulness of an employer's conduct. *Fisher v. Univ. of Kan. Facilities Operations*, 2011 WL 5686349, at *11 (D. Kan. 2011). The relevant question is "whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." *Garcia-Paz*, 873 F. Supp. at 560.

Here, Kay claims that she engaged in protected opposition to racial discrimination when she discussed the discipline of Harris and Reyes with Beahm-Lemmer. Kay was "okay" with the termination of Harris but "strongly opposed" the termination of Reyes. Kay claims she "very clearly raised" her concerns about terminating Reyes to Beahm-Lemmer. Specifically, Kay testified:

> I expressed my concern that [Reyes] was a—not a tenured associate, very short tenured associate that seemed to have one issue or main concern, which was attendance. And I felt that could be resolved with some coaching and development. [Harris] I was in agreement with, simply because she was more tenured, she had multiple corrective actions consistently in the 2-1/2 years, approximately, that I had managed her.

Doc. 90-1 at 138:17-25.

Beahm-Lemmer then explained to Kay that, because Harris was of "protected status," Defendant could be opened to a discrimination suit if both associates were not terminated. Beahm-Lemmer testified that "protected status" was only in reference to Harris's "over-40 status."[9] Doc. 85-3 at 65:6-67:10. The only evidence Kay offers in an attempt to controvert these facts is the following exchange from her deposition testimony:

> A.     When I was told to terminate both associates, I objected and protested to the termination of one of the associates. I raised concerns very clearly with that and was told it was required for me to terminate both associates.
> It was clear that it was being driven by Cheryl's race of being a black woman. And that if I did not terminate both associates, I would open the bank to a discrimination suit. Those were exact words.
>
> Q.     What were exact words? And whose words were they?
>
> A.     Lynda's.
>
> Q.     And what were Lynda's exact words?
>
> A.     That I had to terminate both associates. And because of Cheryl's protected status if I did not terminate both associates, it was going to open the bank to a discrimination suit.

Doc. 90-1 at 136:5-25.

---

[9]   I.e., protected by the Age Discrimination in Employment Act of 1967.

Based on these facts, no reasonable jury could find that Kay sufficiently conveyed her concerns that Defendant was acting in an unlawful discriminatory manner. Kay's testimony merely establishes that she interpreted Beahm-Lemmer's comments as implicating race as a factor in the decision to terminate Harris and Reyes. However, Kay presents no evidence to establish that Kay conveyed her concerns about making an employment decision based on race to Beahm-Lemmer— or that race was even discussed. Indeed, Kay testified that she did not recall Beahm-Lemmer referencing race, and that she personally "did not reference race" during their discussion of Harris and Reyes. Doc. 90-1 at 15:4-18. And the only reasoning Kay gave for not wanting to fire Reyes was that Reyes was more coachable than Harris. Additionally, Plaintiff went on to send emails to Stone recommending termination of Harris and Reyes. Neither email contains any reference to race or discrimination.

Although the Court recognizes that Kay is not required to speak with the clarity or precision of a lawyer, the Court finds that she did not sufficiently convey her concerns that Defendant was acting in an unlawful discriminatory manner. Saying not to fire someone because she had "potential" compared to another employee is not a protected activity because it does not convey a reasonable concern regarding race discrimination. Accordingly, Kay cannot establish that she was engaged in a protected activity. *See Brown v. Keystone Learning Servs.*, 2018 WL 6042592, at *8 (D. Kan. 2018) (holding that employee did not engage in protected activity by having attorney write a letter challenging employee's termination under the terms of employment contract when letter did not infer nor mention that termination decision was unlawful under Title VII); *cf. Garcia-Paz*, 873 F. Supp. at 559 (noting that ADEA retaliation claims do not extend to persons "who simply champion the cause of an older worker, even if the advocate acts out of an unarticulated belief that the employer is discriminating on the basis of age").

### 2.   Defendant has a legitimate, nondiscriminatory reason for Kay's termination.

Even if Kay could establish a prima facie case, Defendant articulates a legitimate, nondiscriminatory reason for Kay's termination. Establishing a legitimate, nondiscriminatory reason is a burden of production and "can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Here, Defendant argues that it terminated Kay's employment for unsatisfactory performance as a result of not following security protocol around branch opening procedures. Kay instructed her associates on more than one occasion to enter the banking branch without the required second opener present in the parking lot. She also instructed them not to contact Defendant's internal security department that would normally observe their entry via video when a second associate is not available. And when questioned about this event, Defendant found that Kay was not being completely honest which created an integrity issue. These are legitimate, nondiscriminatory reasons for terminating Kay's employment. Thus, Defendant meets its burden.

### 3.   Kay cannot establish pretext.

Because Kay failed to establish a prima facie case, summary judgment is appropriate. But, even assuming Kay could establish all of the elements of her prima facie case, Kay's claim also fails because Kay has not shown that Defendant's legitimate non-discriminatory reason is pretextual. A plaintiff will avoid summary judgment only if she can show that the defendant's explanation is mere pretext—that is, that the defendant's asserted reason was not the "true reason" for her termination. *Loudon*, 339 F. Supp. 3d at 1237. The plaintiff can meet this burden by showing: (1) that the defendant's proffered reason is factually false; or (2) that retaliation was a primary factor in the decision, which can be established by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reason, such that "a

reasonable fact finder could deem [the defendant's] reason unworthy of credence." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013) (internal quotations omitted). Speculation that an explanation is pretext is insufficient, as is evidence that the employer was mistaken or used poor business judgment—it does not matter whether the proffered reason was "wise, fair or correct." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169-70 (10th Cir. 2007). Rather, the relevant inquiry is whether the employer honestly believed those reasons and acted in good faith upon its beliefs. *Swackhammer*, 493 F.3d at 1170.

Here, the uncontroverted evidence supports Defendant's proffered reason for Plaintiff's termination, and Kay's evidence is insufficient to create a genuine issue of material fact as to pretext. First, Defendant is consistent in its concerns regarding the reasons for Kay's termination. The undisputed evidence shows that Defendant promptly placed Kay on paid administrative leave and investigated the reports from Harris and Reyes that Kay failed to follow security protocol and placed them in a "risky position." Defendant spoke with Kay to get her side of the story, and she confirmed there were two occasions in January 2019 when she permitted an associate to enter the branch when there was only that associate present. Defendant also reviewed text messages, collected information from other partners, contacted the security department, and reviewed security photos from the branches. Defendant's investigation confirmed that Kay had instructed her subordinates to act contrary to Defendant's security protocols, and that Kay had not been completely honest[10] with Beahm-Lemmer and Stone during their meeting. Kay has presented no evidence to suggest that there were any different or additional reasons for her termination.

---

[10]   Kay does not attempt to controvert Defendant's SOF ¶ 43 regarding Kay's representation to Beahm-Lemmer and Stone about a phone call Kay made to Harris on January 14 immediately prior to Harris entering the branch at 8:28 a.m. According to Beahm-Lemmer, Kay represented that she told Harris to enter the branch because she was on her way to the branch and would be pulling into the parking lot when Harris entered. And it is uncontroverted that

Kay argues that her termination violated Defendant's progressive discipline procedures because she was on no progressive discipline at the time of her termination. But failure to implement progressive discipline is not evidence of pretext if the progressive discipline policy is entirely discretionary. *Montoya v. Jacobs Tech., Inc.*, 764 F. App'x 830, 835-36 (10th Cir. 2019). And here, it is uncontroverted that Defendant's progressive discipline policy provides for immediate termination if the behavior or action "is determined to be severe enough," even if the employee has not received a Level 1 or 2 Written Warning. In contemplating Kay's proper discipline, Defendant specifically determined that Kay was not placed on a Level 2 Written Warning due to the severity of the offenses and the fact that Defendant's officers and managers are held to a higher performance standard than the associates they manage. As stated above, it is not the Court's role to "second guess" the employer's business judgment, or to ask whether the decision was wise, fair, or correct. *Dewitt*, 845 F.3d at 1307. Thus, Defendant's use of discretion was consistent with its progressive discipline policy and cannot establish pretext. *See Montoya*, 764 F. App'x at 836.

Finally, Kay argues that she was treated differently from other similarly-situated employees. In support, Kay cites her deposition testimony where she states that: (1) Stone admitted to Kay that other associates and managers "have done the same thing or worse" and have not been fired; (2) she had personal knowledge of other managers and associates who were in the same situations and did not face the same type of reprimand that she did; and (3) a coworker laughed and told Kay that he had been with Defendant for 25 years and had done far worse. *See* Doc. 90 at 7-8. This testimony is insufficient to establish that she was treated differently from similarly

---

Defendant's investigation revealed that on January 14 at 8:41 a.m., Kay actually entered a different branch, approximately 11 miles away. Moreover, it is uncontroverted that Harris disclaimed that such a call took place, and that Kay could not provide Defendant with a record of such call.

situated employees. Kay does not identify any of the employees whom she considers similarly situated. She presents no evidence regarding these employees' supervisors or their standards governing performance evaluation and discipline. And she provides no details by which a reasonable jury could conclude that these employees violated work rules of comparable seriousness. Kay only presents general, unsubstantiated allegations of different treatment. This is insufficient to establish pretext. *Koppenhaver v. Unified Sch. Dist. No. 500*, 2013 WL 1704917, at *5 (D. Kan. 2013) (holding that general allegations of different treatment with no further detail regarding who these employees are or why they are similarly situated "is insufficient to raise a viable claim of discrimination because they are wholly conclusory and provide only a formulaic recitation of the elements of a claim").

The alleged inconsistencies raised by Kay are simply too minor to give rise to an inference of pretext. *Lucas v. Dover Corp., Norris Div*., 857 F.2d 1397, 1402 (10th Cir. 1988) (concluding instances of alleged contradictions and inconsistencies were too insubstantial to allow a reasonable jury to infer pretext). Although inferences are to be resolved in favor of the plaintiff, a court "is 'not required to evaluate every conceivable inference which can be drawn from evidentiary matter, but only reasonable ones.' " *Id*. at 1401 (quoting *Matthews v. Allis-Chalmers*, 769 F.2d 1215, 1218 (7th Cir. 1985)). Kay has not shown that Defendant's proffered reason is factually false, nor has she shown such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable jury could determine Defendant's reason lacks credibility. *Tabor*, 703 F.3d at 1218. For this additional reason, summary judgment is proper on Kay's § 1981 retaliation claim.

## IV.    CONCLUSION

Kay has not shown a prima facie case of discrimination. And neither Plaintiff has shown pretext. Thus, Defendant is entitled to summary judgment on these claims. Because the Court

grants summary judgment to Defendant, it denies the motion to sever as moot and without prejudice.

THE COURT THEREFORE ORDERS that Defendant's motion for summary judgment on all claims asserted by Plaintiff Danielle Otte Doc. 82) is GRANTED. Judgment is to be entered for Defendant on Otte's claims of gender discrimination and retaliation under Title VII.

THE COURT FURTHER ORDERS that Defendant's motion for summary judgment on all claims asserted by Plaintiff Amber Kay (Doc. 84) is GRANTED. Judgment is to be entered for Defendant on Kay's claim of retaliation under 42 U.S.C. § 1981.

THE COURT FURTHER ORDERS that Defendant's Renewed Motion to Sever (Doc. 86) is DENIED as moot and without prejudice.

IT IS SO ORDERED.

Dated: June 4, 2021                    /s/ *Holly L. Teeter*_____
                                       HOLLY L. TEETER
                                       UNITED STATES DISTRICT JUDGE